# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

     Plaintiff,

     v.                                **Case No. 23-CR-152-JPS-SCD**

NATHAN WINGO,

     Defendant.

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS IN-COURT AND OUT-OF-COURT IDENTIFICATION

This case arises out of two armed carjackings committed in May 2023 by a man wearing a hooded sweatshirt. The day after the second carjacking, Nathan Wingo was arrested after fleeing from the police in one of the stolen vehicles. Within a few days, each victim identified Wingo as the carjacker after viewing a photo array. Wingo was later charged in federal court with the armed carjackings and related crimes.

Wingo has moved to suppress the victims' identifications, arguing that his photo stood out too much from the others, namely because he was the only one wearing a gray hooded sweatshirt. However, the fact that Wingo was wearing a gray hoodie (among other factors) was not so suggestive as to create a substantial likelihood that the victims would misidentify him. Even if the photo arrays were unduly suggestive in some respects, the totality of the circumstances demonstrate that the victims' identifications were reliable independent of any suggestiveness. I will therefore recommend that the suppression motion be denied.

## BACKGROUND

This case involves two carjackings and two photo arrays. The first carjacking occurred in Wauwatosa on May 20, 2023. *See* U.S.'s Opp'n 1, ECF No. 24; Def.'s Reply 1, ECF No. 29. L.D. was pumping gas when a man approached brandishing a firearm and demanding money. After L.D. claimed that he didn't have any, the man ordered him to drive them to a nearby ATM. U.S.'s Opp'n 1–2. L.D. drove his vehicle, and the man sat in the front passenger seat. *Id.* at 2. At the ATM, the man ordered L.D. to withdraw money, but L.D. did not immediately comply. The man struck L.D. in the face, pressed the gun against L.D.'s leg, and fired a round into the rear of the vehicle. L.D. escaped and, while fleeing, the man shot at him twice but missed. The man got in the driver's seat and took off with L.D.'s Jeep.

Wauwatosa police found the Jeep abandoned a few blocks from the ATM. U.S.'s Opp'n 2. They located a 9mm shell casing near the ATM and two 9mm shell casings and a fired bullet inside the Jeep. L.D. told the police that the person who stole his vehicle was an African American male with black cornrows and freckles but no other marks on his face. Def.'s Reply 1. L.D. said the man was wearing a medical mask and a black hoodie at the time of the robbery. L.D. also said the man wasn't scrawny. *Id.* at 1–2.

The second carjacking occurred in Milwaukee at about 12:40 a.m. on May 27, 2023. *See* U.S.'s Opp'n 4; Def.'s Reply 4–5. As E.L. stepped out of her SUV and walked toward the trunk area, a man approached, pointed a black handgun at her, and demanded everything she had. E.L. gave the man her purse, which contained (among other things) her car keys. The man moved the gun closer to E.L. and pointed it at her chest. When E.L. told the man she didn't have anything else, he got into her SUV and fled.

E.L. called 9-1-1 to report the robbery. *See* Def.'s Reply 4. She told the police that the man who took her SUV was an African American male, age 28 to 32, and weighing approximately 180 to 220 pounds. She said the man was wearing a gray hooded sweatshirt and had a partially brown mustache or semi-mustache but nothing else distinguishable about his face. E.L. also said she got a split-second view of the gun, which she described as being silver. *Id.* at 4, 6. She told the dispatcher twice that she was anxious. *Id.* at 4.

The following day, the police attempted to stop the SUV. U.S.'s Opp'n 4. The driver fled, crashed into a building, and took off on foot. During the chase, the driver discarded a black 9mm handgun. He was eventually caught and arrested. The police identified the driver as Nathan Wingo.

On May 29, 2023—two days after the second carjacking—Milwaukee police met with E.L. for a photo array. *See* Def.'s Mot. 1–2, ECF No. 19; U.S.'s Opp'n 4. Before presenting the photos, the police read E.L. a form that explained the person who robbed her at gunpoint may or may not be included in the array. The form also explained that "things like hairstyles, facial hair, and clothing can easily be changed." U.S.'s Opp'n Ex. 2, ECF No. 24-2. The photo array was conducted using eight folders. Def.'s Mot. 2. Each of the first six folders contained a single photograph, and the last two folders were left blank:

3



Copyright © 2004 All rights reserved. ImageWare Systems, Inc.

*Id.* The officer conducting the array knew that one of the folders contained a photograph of Wingo, but the folders were shuffled outside his presence. *Id.* at 1; U.S.'s Opp'n 4–5.

The officer presented the folders to E.L. simultaneously. U.S.'s Opp'n 5. On the form, E.L. circled "no" for six of the eight folders. Def.'s Mot. 2–3. She was unsure about the other two and asked to see the photographs again. After viewing the full array a second time, E.L. circled "yes" for the folder containing Wingo's photo. *Id.* at 3. She said she was positive he was the one who robbed her at gunpoint. U.S.'s Opp'n 5. According to E.L., Wingo had the same face structure, the same cheeks, the same complexion, and the same eyebrows as her carjacker. *Id.* at 11. She also told the police that she felt uneasy when she looked at Wingo's photo, because she believed he was the man who robbed her. *Id.* at 11–12.

The police met with L.D. for a photo array on May 30, 2023—ten days after his Jeep was stolen. Def.'s Mot. 3–4; U.S.'s Opp'n 3. They presented him with the same form that explained the photo array process (eight sequentially presented folders), emphasized that the perpetrator may not be in any of the photos, and noted that the physical features and clothing could easily be changed. *See* U.S.'s Opp'n Ex. 1, ECF No. 24-1. Again, the officer conducting the array knew that Wingo's photo was in one of the folders, but he didn't know which one. Def.'s Mot. 3–4; U.S.'s Opp'n 3. The second array, however, included different filler photographs:



Def.'s Mot. 4. L.D. circled "yes" for the folder containing Wingo's booking photo and signed the photo he identified. *Id.* at 4–5; U.S.'s Opp'n 3. He said he was 100% sure that Wingo was

the guy who robbed him at gunpoint, threatened his life, and stole his Jeep.

Wingo was subsequently indicted for the two carjackings, brandishing a firearm during the carjackings, and unlawfully possessing ammunition and a firearm. *See* Indict., ECF No. 1. The matter is assigned to United States District Judge J.P. Stadtmueller for trial and to me for resolving pretrial motions. *See* 28 U.S.C. § 636; Fed. R. Crim. P. 59; E.D. Wis. Gen. L. R. 72. On December 21, 2023, Wingo filed a motion to suppress the victims' identifications. Def.'s Mot., ECF No. 19. The government filed a brief in opposition to the motion, ECF No. 24, and Wingo filed a reply brief, ECF No. 29.

## DISCUSSION

Wingo seeks an order excluding the victims' photo array identifications and any in-court identification of him at trial, arguing that the photo procedures violated his Fifth Amendment right to due process. "Eyewitness identification testimony violates a defendant's right to due process of law when it creates a 'very substantial likelihood of irreparable misidentification.'" *United States v. Jones*, 454 F.3d 642, 648 (7th Cir. 2006) (quoting *Neil v. Biggers*, 409 U.S. 188, 198 (1972)). Determining whether a particular procedure violates a defendant's constitutional rights involves "a well-settled, two-pronged analysis." *United States v. Recendiz*, 557 F.3d 511, 524 (7th Cir. 2009) (citing *United States v. Griffin*, 493 F.3d 856, 865 (7th Cir. 2007); *Rodriguez v. Peters*, 63 F.3d 546, 556 (7th Cir. 1995); *United States ex rel. Kosik v. Napoli*, 814 F.2d 1151, 1155 (7th Cir. 1987)).

"First, the defendant must establish that the identification procedure was unduly suggestive." *United States v. Hawkins*, 499 F.3d 703, 707 (7th Cir. 2007) (citing *United States v. Rogers*, 387 F.3d 925, 936 (7th Cir. 2004)). An identification procedure is unduly suggestive only if it was "both suggestive and unnecessary." *United States v. Sanders*, 708 F.3d 976, 983–

6

84 (7th Cir. 2013) (quoting *Perry v. New Hampshire*, 565 U.S. 228, 229 (2012)). "In other words, the situation must have involved 'improper state conduct'—one in which the circumstances did not justify law enforcement's suggestive behavior." *Id.* at 984 (quoting *Perry*, 565 U.S. at 245). "In examining the identification process, [courts] focus on the manner in which the witness was shown the suspect's likeness, reserving criticism for procedures that have been orchestrated to yield the identification of one particular suspect." *Jones*, 454 F.3d at 649 (citing *Gregory-Bey v. Hanks*, 332 F.3d 1036, 1045 (7th Cir. 2003); *United States v. Traeger*, 289 F.3d 461, 473–74 (7th Cir. 2002)). "For the most part, these suggestive procedures involve the repeated presentation of only one suspect by the police to a witness, or a lineup in which the suspect is clearly distinguishable from the other persons." *Id.* (citing *Israel v. Odom*, 521 F.2d 1370 (7th Cir. 1975)).

If the defendant establishes that the identification procedure was unduly suggestive, the court must then "examine the 'totality of the circumstances' to determine whether other indicia of reliability 'outweigh[ ] . . . the corrupting effect of law enforcement suggestion.'" *Sanders*, 708 F.3d at 984 (quoting *Perry*, 565 U.S. at 239). This prong "focuses on the identifying witness and her knowledge of the suspect absent the suggestive procedure." *Id.* The Supreme Court has outlined several factors courts should consider in evaluating the reliability of an identification, including "the witness's opportunity to observe the perpetrator at the time of the crime; the witness's degree of attention; the accuracy of the witness's prior description; the witness's level of certainty at the time of the identification; and the length of time that has elapsed between the crime and the identification." *United States v. Miller*, 795 F.3d 619, 628 (7th Cir. 2015) (citing *Biggers*, 409 U.S. at 199–200). The list is non-exhaustive, and a deficiency in one factor does not necessarily undermine the reliability of the

7

identification. *See United States v. Downs*, 230 F.3d 272, 275 (7th Cir. 2000) (emphasizing that the factors are intended to be a guide, not a straitjacket); *Napoli*, 814 F.2d at 1156–57 (considering other indicia of reliability and noting that one of the *Biggers* factors was merely "a single component of a test based on the totality of the circumstances").

Wingo challenges the out-of-court identifications made by both carjacking victims.

## I.    L.D.'s Out-of-Court Identification Did Not Violate Wingo's Due Process Rights

Wingo contends that the photo array shown to L.D. was impermissibly suggestive because his clothing stood out from the group and because several of the others in the array deviated from the suspect's description.

### A.    Wingo has not established that the clothing he wore was unduly suggestive

Wingo's main complaint is that he appeared to be wearing the same outfit that was worn by the perpetrator at the time of the crime, which was unduly suggestive to the witness. The only description L.D. provided about the carjacker's attire was a black hoodie. Three of the individuals in the array were not wearing hooded sweatshirts, and one was wearing a bright red hoodie. Two were wearing dark-colored hoodies but, according to Wingo, his was close to black while the other one was brown.

Wingo's challenge should fail because he never asserts that the alleged unfairness was caused by police conduct; in short, there is simply no allegation the police had anything to do with arranging the sweatshirt Wingo happened to be wearing in the photo. It appears instead that Wingo had been arrested some eight days after stealing L.D.'s car while wearing the same or similar sweatshirt, and that explains why he's wearing it in the booking photo police used in the lineup. For the Due Process Clause to be implicated, however, there must be some suggestion that the police created the condition that rendered the array unfair. The Seventh

8

Circuit has used the term "orchestrated." *Jones,* 454 F.3d at 649. For example, in *United States ex rel. Cannon v. Montanye*, the police directed the defendant to wear a green sweater to the lineup when the witness knew that the suspect had worn a green shirt at the time of the assault. 486 F.2d 263, 266–68 (2d Cir. 1973). That kind of suggestive scenario is entirely lacking here.

Instead, this case is much more like a 2020 case from this district, *United States v. Chappell,* where the defendant complained that he was the only person in the photo array wearing an Adidas jacket. Because the witness had noted that the suspect had also worn an Adidas jacket (albeit of a different color), I recognized in my report and recommendation that the jacket could appear somewhat suggestive of guilt. *United States v. Chappell*, No. 20-CR-241-JPS, 2021 WL 2926216, 2021 U.S. Dist. LEXIS 132360, at *10–13 (E.D. Wis. May 28, 2021), *report and recommendation adopted*, 2021 WL 2915052, 2021 U.S. Dist. LEXIS 128957 (E.D. Wis. July 12, 2021). Even so, there had been no indication that police had ever told the defendant to wear an Adidas jacket for his photo. As such, to the extent the clothing was at all suggestive, it was not the product of government conduct.

Similarly, in *Coleman v. Alabama,* the petitioner complained it was unfair that he was the only one in the lineup wearing a hat, which was somewhat suggestive because one of the suspects had also worn a hat during the crime. 399 U.S. 1, 6 (1970). The Supreme Court gave short shrift to that argument, however, because there was no indication that law enforcement had ever told him to wear a hat:

> [P]etitioner Coleman contends that he was unfairly singled out to wear a hat though all the other participants were bareheaded. One of the attackers had worn a hat. Although the record demonstrates that Coleman did in fact wear a hat at the lineup, nothing in the record shows that he was *required* to do so.

*Id.* (emphasis added).

These cases emphasize that, at this stage of the proceedings, courts are not to undertake a wide-ranging "fashion show" approach to compare the attire of individuals in a challenged array unless there is some indication that the defendant's clothing was suggested or required by law enforcement. There are at least two reasons the inquiry here is so narrow. First, any potential weaknesses in a given witness' identification are exactly the kinds of matters that should be fleshed out during cross-examination at trial, just like any other evidence. Taking such questions away from the jury is a drastic remedy. Here, if Wingo believes his sweatshirt unduly influenced L.D.'s identification, he can explore that avenue at trial. Second, as the *Perry* court noted, one of the purposes of excluding such evidence (rather than letting a jury consider it) is to deter police misconduct, and there is simply no deterrence rationale to exclude evidence "in cases . . . in which the police engaged in no improper conduct." *Perry*, 565 U.S. at 241–422. And so here, exclusion could not "deter" police conduct because the police did not direct Wingo to wear the sweatshirt in the first place. In sum, unless the alleged unfairness was "arranged by law enforcement," *id.* at 248, it does not give rise to a Due Process violation.

Although Wingo's failure to clear the government-arrangement hurdle is fatal to his challenge, I will also address his specific challenges to the lineup. His principal challenge is that the hoodie he wore would have tipped off the witness that he was the assailant. Although the exact shade of the hoodies is somewhat difficult to discern, the one *not* worn by Wingo (left, below) appears closer to black (or at least darker) than the one he wore himself; Wingo's looks more gray:

10



The fact that a person other than Wingo was wearing a sweatshirt that more closely resembled the one worn by the carjacker suggests that the sweatshirt did not influence L.D. to select Wingo's photo. *See Kubat v. Thieret*, 867 F.2d 351, 358 (7th Cir. 1989) (finding that the presence of glasses did not appear to influence a witness's selection where a person other than the defendant was wearing glasses in a second photo array).

Wingo also says that his hoodie had grass on it, likely from his recent arrest. However, Wingo presents no evidence suggesting that the debris on his right shoulder was grass and, even if it was, that L.D. noticed it. L.D. was shown the photo array ten days after the carjacking, and there's no evidence he knew if or when Wingo had been arrested, let alone the circumstances of his arrest. Moreover, the debris is barely perceptible on the photo:



11

And there's no evidence suggesting that the alleged grass played any role in L.D.'s identification. *See Coleman v. City of Peoria*, 925 F.3d 336, 348 (7th Cir. 2019) (lineup not unduly suggestive where the defendant was the only participant not wearing a yellow wristband because there was no evidence the witness "noticed the wristbands, much less that they influenced her identification"); *Traeger*, 289 F.3d at 473–75 (lineup not unduly suggestive where the defendant was the only participant wearing an ankle restraint because it was unlikely the witness noticed the restraint and knew its purpose); *Kubat*, 867 F.2d at 358 (photo array not unduly suggestive where there was no evidence the witness was influenced by the arrest dates depicted on the bottom of each photo); *United States v. Medina*, 552 F.2d 181, 190 (7th Cir. 1977) (lineup not unduly suggestive where the defendant was wearing denim pants, as described by the witness, because nothing in the record indicated that the witness's identification was based on the fact the defendant was wearing denim pants); *United States v. Johnson*, No. 91-3813, 1993 WL 47210, 1993 U.S. App. LEXIS 3218, at *8 (7th Cir. Feb. 24, 1993) (photo array not unduly suggestive where the defendant was one of only three men depicted with glasses, because the witness testified that the presence or absence of glasses did not influence her selection).

Finally, I note that Wingo's generic gray or black sweatshirt was about as humdrum an article of clothing as can be imagined. There were no logos on the shirt or any distinguishing features that could tip off a witness. Courts have held that in cases where "the defendant is the only person in the array wearing particular clothing described by the [witness] as having been worn by the perpetrator, . . . the identification procedure is not suggestive" so long as "the clothing at issue is not unusual[.]" *Maldonado v. Burge,* 697 F. Supp. 2d 516, 543 (S.D.N.Y. 2008) (citations omitted), *report and recommendation adopted*, 697 F. Supp. 2d 516

12

(S.D.N.Y. 2010); *United States v. Williams*, 522 F.3d 809, 812–13 (7th Cir. 2008) (Evans, J., concurring) (finding it "trivial" that the defendant wore white tennis shoes during a lineup while the other participants wore blue slippers, but noting the case may have been different if the defendant had been wearing something more distinctive, like a green sweatshirt with "Girdwood, Alaska" on the front); *United States v. Brown*, No. 3:15-cr-00001-TCB-RGV, 2015 U.S. Dist. LEXIS 117377, at *17–18 (N.D. Ga. Aug. 5, 2015) (noting that a "hooded sweatshirt is [certainly] not such an unusual article of clothing" as to make it "all but inevitable that [the witnesses] would identify [the defendant]" merely because his photo happened to portray him wearing that attire) (citation and internal quotation marks omitted), *report and recommendation adopted*, 2015 WL 5156193, 2015 U.S. Dist. LEXIS 116754 (N.D. Ga. Sept. 2, 2015).

In sum, there's no evidence that law enforcement had anything to do with Wingo's sweatshirt, much less the presence of any grass on it, and so his challenge based on the sweatshirt stalls before it leaves the gate. Even if law enforcement were responsible for his clothing, however, there was nothing unduly suggestive about the sweatshirt he wore in the array photo.

**B.    Wingo's other challenges to the array also fail**

Wingo also challenges the physical (non-clothing) characteristics of the individuals in the photo array. I conclude that the other individuals included in the array bear enough similarities to Wingo and the description provided by L.D. All except for possibly one (bottom center) appear to be African American. They're also all young males with brown eyes and black cornrow hairstyles:

13



Wingo points out that three have longer cornrows, but L.D. did not describe the length of the carjacker's hair, and any difference was not so great as to make the lineup unduly suggestive. After all, the police "are not required to search for identical twins." *Traeger*, 289 F.3d at 474 (lineup not unduly suggestive where the defendant was the largest participant). Wingo says that two of the individuals appear to be much skinnier than he is. But the description L.D. provided as to body type was vague—"a little chunkier than me," "not scrawny"—and it's difficult to tell build from the headshots. Furthermore, Wingo does not identify which two he has in mind, and it's not obvious from looking at the photos that any of the other individuals are significantly skinnier than he is. Wingo also says that only one other individual had a beard. L.D., however, didn't say anything about the carjacker having a beard, and all but one (top right) appear to have at least some facial hair. L.D. also said that the carjacker had freckles and was wearing a medical mask at the time of the crime. The fact that none of the

14

individuals had those features simply placed them on equal footing; it does not make Wingo stand out from the others. One of the individuals (bottom center) does have a tattoo above his left eye, which is inconsistent with L.D.'s statement that the carjacker did not have any marks on his face. Also, another individual (bottom right) appears significantly younger than the others. Those discrepancies, however, did not materially increase the chance of a misidentification.

> **C.** **Assuming that the photo array *was* unduly suggestive, the totality of the circumstances demonstrates that L.D.'s identification is nevertheless reliable**

*Opportunity to view the carjacker at the time of the crime*

The carjacker approached L.D. while he was pumping gas, pointed a handgun at him, and demanded his money. When L.D. claimed that he didn't have any, he drove with the carjacker to an ATM, where the carjacker again threatened him at gunpoint. This was not a brief, point-and-grab robbery; rather, it was a close encounter that likely lasted several minutes. *See Manson v. Brathwaite*, 432 U.S. 98, 114 (1977) (finding this factor weighed in favor of reliability where the encounter lasted two to three minutes and the robber stood within two feet of the witness). Moreover, while the carjacker was wearing a medical mask, L.D. still was able to point out several distinguishing features, including the carjacker's apparent race, sex, eye color, hair color and style, shirt type and color, and body type. L.D. therefore had ample opportunity to view the carjacker at the time of the crime.

*Degree of attention*

Wingo argues that L.D.'s degree of attention was not great because the circumstances were hectic, and he spent some of the time driving from the gas station to the ATM. Although the encounter no doubt was stressful, nothing suggests that fact rendered L.D. unable to offer

15

a reliable identification. *See Hart v. Mannina*, 798 F.3d 578, 592 (7th Cir. 2015) ("The witnesses' encounters with the attackers were brief and stressful, but no evidence suggests that they could not offer reliable identifications."). L.D. paid attention to the carjacker's appearance, and his "attention was likely sharpened by the fact that [he] was being robbed" at gunpoint. *Traeger*, 289 F.3d at 474.

*Accuracy of the witness's prior description*

L.D. told the police that the carjacker was an African American male with brown eyes, black cornrows, and freckles, who wore a black hoodie, and who was not scrawny. Wingo matches this description almost perfectly. Wingo faults L.D. for saying the carjacker had freckles when none are apparent on Wingo's photo. But that single blunder is not fatal to his identification. L.D. accurately identified six out of the seven features he remembered—that's more than enough. *See Brathwaite*, 432 U.S. at 115 (finding this factor weighed in favor of reliability where the witness accurately described the suspect's race, height, build, hair color and style, cheekbone structure, and clothing).

*Level of certainty*

L.D. identified Wingo immediately and emphatically said that Wingo was the one who robbed him at gunpoint, threatened his life, and stole his Jeep. Wingo concedes that this factor weighs in favor of the reliability of L.D.'s identification.

*Passage of time*

L.D. identified Wingo ten days after the carjacking. Although Wingo argues that this factor should weigh heavily against reliability, he cites no authority suggesting that ten days is too long a gap between the crime and the identification. In *Brathwaite*, the Supreme Court suggested that weeks or months may be too long. 432 U.S. at 115–16. The Seventh Circuit,

16

however, has found no issue with gaps of five days, *Downs*, 230 F.3d at 275; three weeks, *Traeger*, 289 F.3d at 474; and even six months, *United States v. Moore*, 115 F.3d 1348, 1360 (7th Cir. 1997). Whatever the outer time limit is, I think it's longer than ten days. For while it may be difficult to remember what you had for lunch a week and a half ago, the image of the person who robbed you at gunpoint likely would still be fresh after that short time.

In sum, each of the five *Biggers* factors strongly supports the reliability of L.D.'s identification, even if the photo array were deemed unduly suggestive.

## II. E.L.'s Out-of-Court Identification Did Not Violate Wingo's Due Process Rights

Wingo's challenge to E.L.'s identification faces similar hurdles. He contends that the photo array shown to E.L. was impermissibly suggestive because he was the only person in the array wearing a gray hooded sweatshirt, which was the description provided by E.L. Wingo insists that his photo also stood out from the others in terms of hair style and facial hair.

### A. Wingo has not established that the array presented to E.L. was unduly suggestive

As discussed above, Wingo was wearing a gray hooded sweatshirt in his booking photo. Law enforcement did not give him the sweatshirt or suggest that he wear it. As such, any suggestiveness due to the sweatshirt was not caused by law enforcement, which means the Due Process Clause is not implicated. In the Supreme Court's words, "the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances *arranged by law enforcement*." *Perry*, 565 U.S. at 248 (emphasis added). Accordingly, if the sweatshirt were suggestive, it would not result in a due process violation.

17

Even if law enforcement had arranged the situation, I would not find the sweatshirt unduly suggestive. Wingo's clothing challenge relies primarily on one case: *Raheem v. Kelly*, 257 F.3d 122 (2d Cir. 2001). The basic facts of *Raheem* are relatively straightforward. Three men robbed a bar, one of whom shot the owner. *Raheem*, 257 F.3d at 125. Witnesses described the shooter as wearing a black leather coat (among other features). *Id.* at 125–26. When presented with a lineup of suspects, the witnesses selected Jehan Abdur Raheem as the shooter. *Id.* at 126. Raheem, the only person wearing a black leather coat during the lineup, was ultimately convicted of the robbery and shooting. *Id.* at 126–29. According to the court of appeals, the lineup was unduly suggestive because Raheem was the only person wearing a black leather coat, a feature the witnesses emphasized in their descriptions of the shooter. *Id.* at 133–36 ("A lineup is unduly suggestive as to a given defendant if he meets the description of the perpetrator previously given by the witness and the other lineup participants obviously do not."). The court noted that the witnesses also repeatedly mentioned the impact the coat had on their identifications. *Id.* at 136–37. The court summarized its suggestiveness finding as follows:

> Plainly, the black leather coat worn by the shooter at the Moulin Rouge was the outstanding feature of the assailant's appearance in the minds of Cooke and Shiloh, was an integral part of the description that each provided to the police and was a critical factor in those witnesses' selection of Raheem from the lineup.

*Id.* at 137. The court went on to find that the identifications were not reliable independent of the black leather coat. *Id.* at 137–40.

*Raheem* does not help Wingo because the supposedly distinctive sweatshirt was not emphasized by the witness in her description of the suspect or during the identification process. The Seventh Circuit has applied this distinction in several cases. For example, the

18

witness in *Medina* described the robber as wearing a faded denim jacket and faded denim blue jeans. 552 F.2d at 182, 188. On appeal, the Seventh Circuit rejected the defendant's argument that the lineup was tainted because he was one of only two participants wearing denim pants. *Id.* at 189–90. The court noted that there was no evidence the police required the defendant to wear denim pants during the lineup, nothing in the record indicated that the witness's identification was based on the fact that the defendant was wearing denim pants, and denim pants—a common item of clothing—were not the outstanding feature of the robber's appearance to the witness or an integral part of the description provided the police. *Id.* at 190. Similarly, in *Moore*, the Seventh Circuit found that a photo array was not unduly suggestive even though the defendant was the only person depicted with a notched eyebrow, because only one of the four witnesses mentioned a distinctive eyebrow in his description to the police and only two of the witnesses mentioned the eyebrow as the basis for their identifications. 115 F.3d at 1359–60. And in *Johnson*, the Seventh Circuit found a photo array not unduly suggestive where three of the eight men (including the defendant) were depicted with glasses despite the witness not mentioning glasses in his description: "Where there is no evidence that the witness was influenced by an allegedly distinguishing feature, we have found it not to be unduly suggestive." 1993 U.S. App. 3218, at *8.

The fact that Wingo was the only person wearing a gray hooded sweatshirt does not make the photo array presented to E.L. unduly suggestive. First, nothing in the record indicates that the sweatshirt was the outstanding feature of the carjacker's appearance to E.L. or an integral part of the description she provided the police. E.L. mentioned several features other than the sweatshirt, including that the carjacker appeared to be an African American

19

male, age 28 to 32, weighing 180 to 220 pounds, and having a partially brown mustache or semi-mustache. All six of the individuals in the photo array met that description:



Unlike in *Raheem*, where the witnesses emphasized that the shooter was wearing a black leather coat, E.L. never said the sweatshirt stood out to her. Moreover, the fact that the shirt had a hood was largely irrelevant. It's not as though E.L. described someone who actually wore the hood up or used the hood to shield part of his face. Instead, Wingo's hood, while clearly visible in the photo, is merely an incidental component of his photo.

      Second, there's nothing distinctive about the sweatshirt aside from its color and the fact it had a hood. E.L. did not describe any patterns or words. In fact, sweatshirts with hoods ("hoodies") are ubiquitous and hardly noteworthy. *Cf. Williams*, 522 F.3d at 812–13 (Evans,

J., concurring) (distinguishing commonly worn items like white tennis shoes from distinctive clothing like a green sweatshirt with "Girdwood, Alaska" on the front).

Third, nothing in the record indicates that E.L.'s identification was influenced by the hooded sweatshirt. Although Wingo's shirt appears to be the only one with a hood, all the shirts are roughly the same color. Moreover, when E.L. made her identification, she told the police that Wingo had the same face structure, cheeks, complexion, and eyebrows as her carjacker. She also said that looking at his photo made her feel uneasy. Crucially, she never mentioned the sweatshirt.

Wingo's other issues with the array are far more trivial. He points out that he was the only person with a cornrow hairstyle. That's true. But "[a] 'lineup of clones is not required.'" *United States v. Johnson*, 745 F.3d 227, 230 (7th Cir. 2014) (quoting *United States v. Arrington*, 159 F.3d 1069, 1073 (7th Cir. 1998)). All six individuals have roughly the same length and color of hair, and E.L. never mentioned hairstyle in her description to the police or as a basis for her identification. Wingo also says that his facial hair was different from the others. E.L. told the police that her carjacker had a partially brown mustache or semi-mustache. All the individuals depicted have some facial hair, and nothing about Wingo's mustache and goatee significantly stands out from the others' facial hair. Also, while E.L. indicated that she chose Wingo's photo because his facial features matched those of her carjacker, she never mentioned Wingo's facial hair. Thus, nothing in the record indicates that Wingo's hairstyle or facial hair influenced E.L.'s identification.

Wingo therefore has not established that the police chose comparator photos that made his own photo stand out from the others in the array.

**B.** **Assuming that the photo array was unduly suggestive, the totality of the circumstances demonstrates that E.L.'s identification is nevertheless reliable**

*Opportunity to view the carjacker at the time of the crime*

Wingo argues that E.L. couldn't have had a good opportunity to view her carjacker because the robbery was very brief, and it was dark outside at the time. The carjacking involving E.L. does appear to have unfolded more rapidly than the first carjacking. The robber approached E.L. brandishing a handgun, took her purse, and pointed the gun at her chest. When E.L. claimed she didn't have anything else, the robber took off in her SUV. And E.L. told the police that she got only a "split-second" view of the gun. Wingo estimates the carjacking was over in less than a minute. Still, time likely passed slowly during that highly stressful encounter. *See Downs*, 230 F.3d at 275 ("Although 50 seconds may not sound like much, under conditions of great stress they can pass quite slowly."). Also, while it likely was dark at the time (12:40 a.m.), there's no evidence in the record describing the lighting. (The parties tell me L.D. was robbed at a gas station; I have no idea where the other carjacking occurred, other than that it was in Milwaukee.) Despite those potential issues, the robber was not wearing a mask, and he got close enough to grab E.L.'s purse and stick a gun in her chest.

*Degree of attention*

Wingo says that E.L.'s degree of attention also was not great, as she twice told dispatch that she was anxious. No doubt the incident was traumatic. Yet, E.L. still was able to get a good look at her carjacker, documenting his apparent race, sex, age, weight, facial hair, and clothing. She was also not a casual observer, but rather the victim of a face-to-face armed robbery.

22

*Accuracy of the witness's prior description*

E.L.'s description was detailed and thorough. She described her carjacker as an African American male, age 28 to 32, weighing 180 to 220 pounds, having a partially brown mustache or semi-mustache, and wearing a gray hooded sweatshirt. She also said the gun looked silver. Although Wingo appears to match this description in all respects, he was actually 22 years old at the time of the carjacking. That slight difference, however, is inconsequential, especially considering he doesn't look that young in his booking photo. Wingo also points out that the gun was almost entirely all black, not silver, and that he had a beard as well as a mustache. Fair enough. But the witness's description need not "satisf[y] Proust." *Biggers*, 409 U.S. at 200. E.L.'s description, perhaps off on a few details, got most of them right; it was "more than ordinarily thorough." *Id.*

*Level of certainty*

E.L. did not pick out Wingo's photo when she viewed the array the first time. She ruled out four of the individuals, said she was unsure about the other two, and asked to see the photos again. On the second go-around, E.L. stared at Wingo's photo for about two minutes before circling "yes" for that folder. She then told the police that she was positive Wingo was her carjacker.

Wingo argues that E.L.'s hesitation weighs heavily against the reliability of her identification; I disagree. This is not the case where a witness, after failing to make an identification during a first array or lineup, was provided a second showing that repeated the suspect—and only that suspect—from the first. *See, e.g.*, *Reyes v. Nurse*, 38 F.4th 636, 645–47 (7th Cir. 2022). Rather, the police used the same photo array for both viewings, and only minutes passed between them. Nor is there any evidence in the record that the police made

23

suggestive comments during either viewing. Thus, based on the facts of this case, E.L.'s initial hesitation "reflect[s] only a natural and proper reluctance to misidentify an innocent party." *Odom*, 521 F.2d at 1376. She wanted to make sure she had the right guy. The queasy feeling she said she had when viewing Wingo's photo gave her confidence that she did. *See Downs*, 230 F.3d at 275 ("Brown's dramatic reaction when Downs walked into the room showed clearly that she was quite certain that Downs was the robber.").

*Passage of time*

E.L. identified Wingo's photo about forty-eight hours after she was robbed. Wingo says this was not a short passage of time. The Seventh Circuit, however, explicitly held in *Odom* that an identification within less than 48 hours of an assault occurred "at a time when the events and faces were fresh in the victim's mind and before her memory had been blurred by the passage of time." 521 F.2d at 1376; *see also Brathwaite*, 432 U.S. at 115–16 (finding reliable a photographic identification that took place "only two days" after the crime).

Overall, these factors show that E.L.'s ability to make an accurate identification was not outweighed by any corrupting effect of the challenged photo array. Several of the factors, including the accuracy of her description, her high level of certainty, and the brief passage of time between the crime and her identification, weigh heavily in favor of a reliable identification. The other two factors, the opportunity to view the carjacker and E.L.'s degree of attention, are at worst neutral. None of the *Biggers* factors weighs heavily against E.L.'s ability to make an accurate identification, and Wingo does not point to any other circumstances that call into question her identification.

*         *         *

24

In sum, Wingo's challenge to the clothing he wore in his booking photo fails because law enforcement did not direct or require him to wear the sweatshirt he now alleges was incriminating. Moreover, the photos used in both arrays did not create a very substantial likelihood of an irreparable misidentification. The arrays were presented sequentially, the officer conducting the arrays didn't know which folder contained Wingo's photo, all the individuals roughly matched the descriptions provided by L.D. and E.L., and Wingo did not stand out from the others in any meaningful way. Simply put, Wingo has failed to establish that either array was unduly suggestive. Even if he had, the totality of the circumstances demonstrates that each identification carried sufficient indicia of reliability independent of any suggestiveness concerning the photo array. Because the out-of-court identifications did not violate Wingo's due process rights, there's no reason to preclude any future in-court identification of Wingo as the carjacker. A jury should decide the weight that attaches to such an identification.

## CONCLUSION

For all the foregoing reasons, the court **RECOMMENDS** the district judge **DENY** the defendant's motion to suppress, ECF No. 19. The court directs the parties' attention 28 U.S.C. § 636(b)(1)(B) and (C), Fed. R. Crim. P. 59(b), and E.D. Wis. Gen. L. R. 72(c), whereby written objections to any recommendation herein, or part thereof, may be filed within fourteen days of the date of service of this recommendation. Objections must be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Failure to file a timely objection with the district judge shall result in a waiver of a party's right to appeal. If no objection, response, or reply will be filed, please notify the district judge in writing.

Case 2:23-cr-00152-JPS    Filed 03/18/24    Page 25 of 26    Document 30

Dated at Milwaukee, Wisconsin, this 18th day of March, 2024.

_____
STEPHEN C. DRIES
United States Magistrate Judge