# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　　　Plaintiff,<br>v.<br><br>NATHAN WINGO,<br><br>　　　　　　　　　　Defendant. | Case No. 23-CR-152-JPS<br><br><br>**ORDER** |

**1.　　INTRODUCTION**

　　　　On August 15, 2023, the grand jury returned a six-count Indictment charging Defendant Nathan Wingo ("Defendant") with two counts of motor vehicle robbery in violation of 18 U.S.C. § 2119(1), two counts of brandishing a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(i)–(iii) and (c)(1)(A)(i)–(ii), respectively, and two counts of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). ECF No. 1. On December 21, 2023, Defendant filed a motion to suppress any in-court and out-of-court identification of Defendant by two civilian witnesses on the bases that two separate photo arrays conducted by law enforcement were impermissibly suggestive and the resulting identifications were unreliable. ECF No. 19 at 1 (citing *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)). On March 18, 2024, Magistrate Judge Stephen C. Dries issued a report and recommendation (the "R&R") that the motion to suppress be denied in full. ECF No. 30.

　　　　On April 19, 2024, Defendant filed objections to the R&R, and on May 1, 2024, the Government responded to the same. ECF Nos. 32, 33. For

the reasons explained in the balance of this Order, the Court will adopt in part and overrule in part the R&R, and it will accordingly grant in part and deny in part the underlying motion to suppress.

## 2. STANDARD OF REVIEW

When reviewing a magistrate judge's R&R, this Court is obliged to analyze de novo "those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). The Court can "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id.* The Court's review encompasses both the magistrate judge's legal analysis and factual findings. *See id.; see also* Fed. R. Crim. P. 59(b). In turn, "[p]ortions of a recommendation to which no party objects are reviewed for clear error." *United States v. Musgrove*, 845 F. Supp. 2d 932, 937 (E.D. Wis. 2011) (citing *Johnson v. Zema Sys. Corp.*, 170 F.2d 734, 739 (7th Cir. 1999)).

## 3. FACTUAL BACKGROUND

The parties generally agree with Magistrate Judge Dries's recitation of the background facts. Thus, the Court adopts the background facts set forth in the R&R and briefly summarizes them here. The Court includes additional details from the objections and response.[1]

This case involves two carjackings and two photo arrays. The first carjacking occurred on May 20, 2023 in Wauwatosa, Wisconsin. ECF No. 30 at 2. The victim, L.D., was at a gas station when a man approached him with a handgun. *Id.* The man demanded that L.D. give him money. *Id.* When L.D. responded that he did not have any money, the man ordered L.D. to drive

---

[1] Internal citations within the R&R, the objections, and the response are omitted for brevity.

them both to an ATM. *Id.* L.D. drove to an ATM, where the man ordered L.D. to withdraw money. *Id.* When L.D. did not immediately do so, the man struck L.D. in the face, pressed his firearm against L.D.'s leg, and fired a round into the rear of the vehicle. *Id.* L.D. got out of the vehicle and ran away. *Id.* While L.D. was fleeing, the man fired two rounds at L.D. but missed. *Id.* The man then drove away in L.D.'s car. *Id.* Wauwatosa police later located the abandoned car a few blocks from the ATM. *Id.*

The second carjacking occurred on May 27, 2023 in Milwaukee, Wisconsin at 12:40 A.M. *Id.* The victim of the second carjacking, E.L., had stepped out of her vehicle and was walking towards the trunk when a man approached, pointed a black handgun at her, and demanded everything she had. *Id.* E.L. gave the man her purse, which contained her car keys. *Id.* The man moved the firearm closer to E.L. and pointed it at her chest. *Id.* After E.L. said that she didn't have anything else, the man fled in her car. *Id.*

On May 28, 2023, the police saw and attempted to stop E.L.'s vehicle. *Id.* The driver fled, crashed into a building, and took off on foot. *Id.* During the chase, the driver discarded a black 9mm handgun. *Id.* The driver was eventually caught and arrested, and police identified him as Defendant. *Id.*

Following his May 20, 2023 carjacking, L.D. told police that the man who carjacked him was African American with brown eyes, a black cornrows hairstyle, and freckles on his face. *Id.*; ECF No. 32 at 1. L.D. said that the man otherwise had no marks on his face and was "chunkier" than L.D. and "not scrawny." ECF No. 32 at 2 (citation omitted); ECF No. 30 at 2. L.D. stated that the man was wearing a medical mask and a black hooded sweatshirt ("hoodie"). ECF No. 32 at 2; ECF No. 30 at 2. The responding officer noted that L.D. was "visibly shaken, out of breath, and distraught"

and that he "had ringing in his right ear from the suspect shooting a handgun." ECF No. 32 at 5–6.

On May 30, 2023, the police met with L.D. for a photo array. ECF No. 30 at 5. Before presenting the photos, the police read L.D. a form that explained that the person who carjacked him may or may not be included in the array. *Id.* at 5, 3. The form also explained that "things like hairstyles, facial hair, and clothing can easily be changed." *Id.* The officer conducting the array knew that Defendant's photo was in one of the folders, but he didn't know which one. *Id.* The photo array was conducted using eight folders. *Id.* Each of the first six folders contained a single photograph, and the last two folders were left blank. These following photos were in the array presented to L.D.:



*Id.* L.D. circled "yes" for the folder containing Defendant's photo and signed the photo he identified. *Id.* at 5. L.D. stated that he was 100% sure that Defendant was the man who carjacked him. *Id.* at 5–6.

Following her May 27, 2023 carjacking, E.L. called 911 to report the incident and told police that the man who carjacked her was African American, aged 28 to 32, and weighed approximately 180 to 220 pounds. *Id.* at 3. She described the man as wearing a heather gray hoodie with a logo, noted the size and location of the logo, and stated that the hoodie was a pullover with no zipper. *Id.*; ECF No. 32 at 7. She provided extra commentary on the color of the hoodie and endeavored to show the police an item of a similar color as the hoodie. ECF No. 32 at 6–7. E.L. also described the man as having a partially brown mustache or semi-mustache, but that there was nothing else distinguishable about his face. ECF No. 30 at 3. She specifically stated that the man had the "same type of facial hair structure" as the officer with whom she was speaking, but with less "chin hair" than the officer. ECF No. 32 at 7. The officer with whom E.L. was speaking is shown below:




*Id.* at 8. E.L. also stated that the man appeared to have head hair under his hood, and that she thought the gun was silver based on a "split-second view." *Id.* at 7; ECF No. 30 at 3. E.L. twice stated to police during these descriptions that she was anxious. ECF No. 30 at 3.

On May 29, 2023, the police met with E.L. for a photo array. *Id.* at 3. Before presenting the photos, the police read E.L. the same form that was read to L.D. and followed the same sequential photo array process. *Id.* However, E.L. was shown a different photo array than was shown to L.D.:



*Id.* at 3–4. On the form, E.L. circled "no" for six of the eight folders. *Id.* at 4. She was unsure about the other two and asked to see the photographs again. *Id.* The two photos of which E.L. was unsure are shown side-by-side below:



ECF No. 32 at 13–14. While viewing the full array a second time, E.L. stared at the photo of Defendant for approximately two minutes and then circled "yes" for Defendant's photo. *Id.*; ECF No. 30 at 4. E.L. said that she was positive that Defendant was the one who carjacked her because he had the same face structure, cheeks, complexion, and eyebrows as her carjacker, and looking at his photo gave her an uneasy feeling. ECF No. 30 at 4.

4. **ANALYSIS**

Courts "apply a two-part test to determine the admissibility of challenged identification testimony. The defendant must first establish that the identification procedure was unnecessarily suggestive. If the defendant satisfies this burden, the court considers whether, viewed under the totality of the circumstances, the identification is reliable despite the suggestive procedure." *United States v. Donaldson*, 978 F.2d 381, 385 (7th Cir. 1992) (citing *Kubat v. Thieret*, 867 F.2d 351, 357 (7th Cir. 1989) and *United States v. Johnson*, 859 F.2d 1289, 1294 (7th Cir. 1988)).

As to the first prong, Defendant does not object to the procedures— e.g., the sequential showing of the photos or that the police conducted the array "blinded"—utilized for and during the photo arrays; therefore, and because the Court finds no error in Magistrate Judge Dries' analysis on this point, the Court adopts the R&R as to the propriety of those practices. ECF

No. 30 at 25. The Court focuses instead on the thrust of Defendant's objections: whether the photo arrays were unduly suggestive given the other participants' appearances as compared to Defendant's. Magistrate Judge Dries concluded that they were not. *Id.* For the reasons set forth below, the Court parts with Magistrate Judge Dries and finds that the photo array shown to E.L. was unduly suggestive, while the photo array shown to L.D. was not.

"A lineup is unduly suggestive as to a given defendant if he meets the description of the perpetrator previously given by the witness and the other lineup participants obviously do not." *Raheem v. Kelly*, 257 F.3d 122, 134 (2d Cir. 2001) (citing *Israel v. Odom*, 521 F.2d 1370, 1374 (7th Cir. 1975)). "Lineups in which suspects are the only participants wearing distinctive clothing or otherwise matching important elements of the description provided by the victim have been severely criticized as substantially increasing the dangers of misidentification." *Israel*, 521 F.2d at 1374 (citing *United States ex rel. Pierce v. Cannon*, 508 F.2d 197, 201 n.5 (7th Cir. 1974) and *Foster v. California*, 393 U.S. 440, 443 (1968)).

The Court begins with the photo array shown to L.D. Defendant argues that the photo array was unduly suggestive for several reasons: that Defendant is "the only person in the photo array wearing a hoodie that is similar in color to . . . black," that Defendant's hoodie has grass on it from his arrest, that Defendant's cornrow hairstyle is shorter than the other participants' cornrows, that one participant has a mark on his forehead, that some participants are much thinner than Defendant, that one participant appears significantly younger than Defendant, and that only one other participant has facial hair. ECF No. 32 at 2–3.

Initially, the Court agrees with Defendant that Magistrate Judge Dries's analysis places too heavy a burden on Defendant. Magistrate Judge Dries reasons that the lineup was not unduly suggestive because there is no indication that police told Defendant to present himself for his photo in the way that he did. ECF No. 30 at 9–10. While the police must create the suggestive circumstances, "what triggers due process concerns is police *use of* an unnecessarily suggestive identification procedure, whether or not they *intended* the arranged procedure to be suggestive." *Perry v. New Hampshire*, 565 U.S. 228, 232 n.1 (2012) (emphases added). Thus, the fact that there is no evidence here that the police directed or told Defendant to present himself in the way that he did for the photo is a factor relevant to the analysis, but it is not dispositive. Evidence of police "*mens rea*" is not required for a lineup to be unduly suggestive. *Id.*; *see also, e.g., United States v. Medina*, 552 F.2d 181, 190 (7th Cir. 1977) (considering as one factor among many that "nothing in the record demonstrates that defendant was required to wear denim pants during the lineup . . . [or that the witness's] identification was based upon the fact that defendant was wearing denim pants") (citing *Coleman v. Alabama*, 399 U.S. 1, 6 (1970)).

However, Defendant's contentions as to the photo array shown to L.D. are meritless for several other reasons. Defendant's suggestion that the grass on his hoodie may have tipped L.D. off to the fact that the photo was a booking photo following a recent arrest is unavailing. The Seventh Circuit has concluded that "the mere use of a 'mug shot' is not necessarily suggestive," particularly where other photos in the array are also mug shots. *United States v. Johnson*, 986 F.2d 1425, 1993 WL 47210, at *3 (7th Cir. Feb. 24, 1993) (citing *Kubat*, 867 F.2d at 358). In this case, at least five of the six photos shown to L.D. appear to be mug shots. Moreover, as in *Johnson*, it is

"unlikely that the presence of the [grass on the hoodie] would alone permit the witness to discern its function." *Id.* (so concluding as to a "'string' . . . hold[ing] the prisoner identification number").

Similarly, while some other participants may appear younger, thinner, or have facial marks that Defendant does not, these discrepancies are "not so egregious that [they] tipped the scales unfairly." *United States v. Chappell*, No. 20-CR-241, 2021 WL 2926216, at *3 (E.D. Wis. May 28, 2021). Although these differences are present, the participants all have the same complexion and black cornrows hairstyle. L.D. did not indicate in his statement to police that he noticed the length of his assailant's cornrows. And contrary to Defendant's contentions, five of the six participants have some facial hair, which—regardless of whether L.D. noticed facial hair (and his description to the police does not suggest that he did)—shows that facial hair did not set Defendant apart from the other participants. These similarities are "far more specific and concrete than age," *id.*, and build is difficult to discern from photos that show only the participants' faces. *United States v. Franklin*, No. 21-CR-00069-1, 2023 WL 5748360, at *3 (N.D. Ill. Sept. 6, 2023) ("Because only the head, neck and shoulders of each man is visible in the photo array, there is no clear indication that the men have differing physical builds.").

Turning to the hoodie, L.D. told the police that his assailant wore a black hoodie. In the array shown to L.D., Defendant is neither the only participant wearing a hoodie, nor is he the only participant wearing dark clothing. Three participants are wearing hoodies and three participants are wearing dark clothing. With these facts in mind, and against the backdrop of the array, which otherwise "showed a wide range of colors of clothing," "[Defendant] didn't stick out like a sore thumb, with the outfit screaming

'Pick Me.'" *Mims v. City of Chicago*, No. 18-CV-7192, 2024 WL 1075152, at *14 (N.D. Ill. Mar. 12, 2024); *see also United States v. Daniels*, 97 F.4th 800, 810 (11th Cir. 2024) ("[S]ignificantly, despite [the defendant's] claim that he was the only one shown in a black hoodie, (i) all but one of the men were wearing clothing that appears to be a sweatshirt or hooded sweater, (ii) three of the men were wearing dark sweaters, and (iii) another man was wearing a dark sweatshirt with white drawstrings.").

In any event, there is no indication from the record that the black hoodie—as opposed to the black cornrows hairstyle, which is a significantly more specific description—was a salient detail for L.D. *See Israel*, 521 F.2d at 1374; *Medina*, 552 F.2d at 190 ("Defendant also contends that the lineup was tainted since defendant was placed in the lineup wearing the same clothes as the robber wore at the time of the commission of the crime. . . . [However,] denim pants were not the outstanding feature of the robber's appearance to [the witness] nor were they an integral part of the description provided the police.") (citations omitted). Because the photo array shown to L.D. was not unduly suggestive, the analysis ends there. *Donaldson*, 978 F.2d at 385. The Court accordingly adopts the portion of the R&R and denies the portion of the underlying motion to suppress that pertain to L.D.'s pretrial photo array identification of Defendant.

The Court's conclusion differs as to the photo array shown to E.L. The record indicates that the gray hoodie *was* a salient detail for E.L. E.L. provided many details about the hoodie to the police, including seemingly unprovoked commentary on the color of the hoodie and the size and location of the logo. She attempted to show officers another item that she believed matched the color of her assailant's hoodie. While she provided other descriptions of her assailant, it appears that the hoodie was a standout

feature for her. Defendant is then the only individual in the photo array shown to L.D. wearing a gray hoodie. Indeed, he is the only one wearing a hoodie at all, and he is the only one wearing specifically heather gray. Even a relatively common article of clothing can become distinctive and unduly suggestive under these circumstances. *See, e.g., Israel*, 521 F.2d at 1374 ("[The defendant] was the only person in the lineup to wear glasses, the outstanding feature of the assailant's appearance to the victim and an integral part of the description provided the police."); *Raheem*, 257 F.3d at 135–36 (lineup unduly suggestive where the defendant was the only lineup participant wearing a black leather coat and witness had "given the police descriptions that emphasized the shooter's black leather coat").

The gray hoodie is, moreover, an exact match to what E.L. described to the police, even though the logo is not visible in the photo. *Cf. Maldonado v. Burge*, 697 F. Supp. 2d 516, 543–44 (S.D.N.Y. 2010) ("The article of clothing at issue, a blue shirt, is not at all unusual, nor was the blue shirt an outstanding feature of the perpetrator's appearance to [the witness]. . . . Furthermore, [the witness] testified that the perpetrator was wearing a blue and red jacket over a blue shirt when he robbed her; he was not wearing this jacket in the lineup."); *Medina*, 552 F.2d at 190 ("Defendant was not, however, dressed exactly as the robber was dressed. On the day of the robbery, [the witness] told the police that the robber wore a faded denim jacket as well as faded denim blue jeans. Defendant was not wearing a denim jacket during the lineup.").

E.L.'s photo array also took place two days after her carjacking, during which time Defendant was booked into custody, which increases the likelihood that Defendant would still be wearing a gray hoodie in his booking photo that was used in the array. *Cf. Futrell v. Roper*, No.

Page 12 of 15

Case 2:23-cr-00152-JPS   Filed 05/24/24   Page 12 of 15   Document 34

4:09CV00028 AGF, 2012 WL 1060117, at *11 (E.D. Mo. Mar. 29, 2012) ("[T]he lineup . . . was not conducted until several weeks after the crimes, so there is less reason to suspect that the clothing of the participants in the lineup would be unduly suggestive of the perpetrator, as clothing can easily be changed.") (citing *Chandler v. Sherry*, No. 08-CV-10249, 2010 WL 4791147, at *11 (E.D. Mich. Nov. 17, 2010)). And once E.L. had narrowed the photo array down to only two participants, the role of the gray hoodie was even more pronounced and may have been part of what gave her the "uneasy" feeling that Defendant was her assailant. The Court thus cannot conclude that the gray hoodie "in no way influenced [E.L.'s] selection." *Johnson*, 1993 WL 47210, at *3.

The other issues with E.L.'s photo array to which Defendant points—that he is the only participant with a cornrows hairstyle and that half of the other participants lack chin hair or have minimal chin hair (whereas E.L. suggested in her discussion with police that her assailant had a fair amount of chin hair)—increase the suggestiveness of the gray hoodie. *See Israel*, 521 F.2d at 1374 (holding that, where the defendant was the only participant wearing glasses, combined with a "variation in height," the lineup was unduly suggestive). The Court therefore concludes that the photo array shown to E.L. was unduly suggestive.

Having so concluded, the Court turns to whether, "viewed under the totality of the circumstances, the identification is reliable despite the suggestive procedure." *Donaldson*, 978 F.2d at 385 (citations omitted). "The Supreme Court has listed several factors to consider in determining the reliability of a challenged identification, including the witness's opportunity to observe the perpetrator at the time of the crime; the witness's degree of attention; the accuracy of the witness's prior description;

Page 13 of 15

Case 2:23-cr-00152-JPS   Filed 05/24/24   Page 13 of 15   Document 34

the witness's level of certainty at the time of the identification; and the length of time that has elapsed between the crime and the identification." *United States v. Miller*, 795 F.3d 619, 628 (7th Cir. 2015) (footnote omitted) (citing *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972)).

Here, the carjacking took place at 12:40 A.M. It was dark outside, and E.L. concededly only got brief views of her assailant. She incorrectly described the handgun as silver. In fact, the hoodie appears to be the item about which she was most confident, as she hedged many other descriptions of her assailant with qualifiers as to the length of time she saw them. She twice stated that she was anxious—and understandably so. Finally, she exhibited uncertainty while viewing the photo array, requiring a second opportunity to view the full array after being torn between two participants. The two-day gap between the carjacking and the photo array does not outweigh the impact of these other factors when compared to the suggestiveness of the gray hoodie and Defendant's other standout features in the photo array. On balance, therefore, the *Biggers* factors indicate that E.L.'s ability to make an accurate identification does not "outweigh[] . . . the corrupting effect of" the unduly suggestive photo array. *United States v. Sanders*, 708 F.3d 976, 984 (7th Cir. 2013) (quoting *Perry*, 565 U.S. at 239). Accordingly, E.L.'s identification of Defendant from the photo array will be suppressed, and the Court will overrule the portion of the R&R and grant the portion of the motion to suppress that pertain to E.L.'s pretrial photo array identification of Defendant.

However, this conclusion does not necessarily extend to an in-court identification of Defendant. "Even if the photo array prove[s] unnecessarily suggestive, the district court [may] nonetheless properly admit[] [a witness's] in-court identification if 'clear and convincing evidence [shows]

that [it] was based upon observations . . . other than at the prior, illegal identification . . . .'" *Sanders*, 708 F.3d at 989 (quoting *Cossel v. Miller*, 229 F.3d 649, 655 (7th Cir. 2000)). Although Defendant moves to suppress both in-court and out-of-court identifications, the argument as to in-court identification is not developed. Thus, the Court will reserve until trial the issue of whether an in-court identification by E.L. is admissible.

5. **CONCLUSION**

Based on the foregoing, the Court adopts in part and overrules in part Magistrate Judge Dries's R&R and grants in part and denies in part Defendant's motion to suppress.

Accordingly,

**IT IS ORDERED** that Magistrate Judge Stephen C. Dries's Report and Recommendation, ECF No. 30, be and the same is hereby **ADOPTED in part and OVERRULED in part**;

**IT IS FURTHER ORDERED** that Defendant Nathan Wingo's motion to suppress, ECF No. 19, be and the same is hereby **GRANTED in part and DENIED in part**; and

**IT IS FURTHER ORDERED** that E.L.'s pretrial photo array identification of Defendant Nathan Wingo be and the same is hereby **SUPPRESSED**.

Dated at Milwaukee, Wisconsin, this 24th day of May, 2024.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge